UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LINDA BERNING, )  | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|   v. ) | CIVIL NO. 1:06cv87 |
| ) | |
| UAW LOCAL 2209, UAW ) | |
| INTERNATIONAL UNION, and ) | |
| GENERAL MOTORS CORPORATION, ) | |
| ) | |
|     Defendants. ) | |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the

International Union, United Automobile, Aerospace and Agricultural Implement Workers of

America, UAW and UAW Local 2209 ("Union defendants") on May 23, 2007.  The plaintiff,

Linda Berning ("Berning"), proceeding pro se, filed her response on July 5, 2007, to which the

Union defendants replied on July 30, 2007.

For the following reasons, the motion for summary judgment will be granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact

2

exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of

Material Facts" supported by appropriate citation to the record to which the moving party

contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a

"Statement of Genuine Issues" supported by appropriate citation to the record outlining all

material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v.

American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment

motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences

in favor of the non-moving party, and does not weigh the evidence or the credibility of

witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the

motion for summary judgment, the court will assume that the facts as claimed and supported by

admissible evidence by the moving party are admitted to exist without controversy, except to the

extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to

the motion.  L.R. 56.1

     Substantive law determines which facts are material; that is, which facts might affect the

outcome of the suit under the governing law.  Anderson, 477 U.S. at 248.  Irrelevant or unneces-

sary facts do not preclude summary judgment even when they are in dispute.  Id.  The issue of

fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the

material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities

Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with

specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment

determination is essentially an inquiry as to "whether the evidence presents a sufficient disagree-

ment to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Berning is an hourly production employee of General Motors Corporation (GM) at its Fort Wayne Assembly Plant and a member of the UAW International Union and its Local 2209 (Berning Dep. I, 24-27) Production and maintenance employees at these facilities are represented for purposes of collective bargaining by the UAW International Union and its Local 2209. (Id., 25; LeTourneau Declaration ¶5, Ex. A ) At all times material to this motion, Berning has remained continuously employed by GM at this facility with no loss of work due to the alleged breach of contract. (Berning Dep. I, 26-27, 41-44; Berning Dep. II, 269-70).

Berning has filed this action *pro se to* seek redress for alleged mistreatment by her employer's medical department and worker's compensation administrator, and by her union representatives who were unable to procure the results she desired from her grievances. All of Berning's actions filed in this Court and elsewhere (including the union grievances she filed) arise out of her efforts to contest GM's denial of worker's compensation coverage for certain injuries she sustained during the time she has been employed by GM. (Berning Dep. I, 99) Her previous filings include her Indiana Worker's Compensation claim (Id., 117; n. 3, infra), two unfair labor practice charges against the Union defendants for breach of the duty of fair representation (Berning Dep. I, Exs. 26, 27, 29, 34, 35, 36, 37), and complaints with the Indiana

4

Attorney General against the GM plant doctor and nurse. (*Id.,*158, Exs. 19, 20)

Berning's employment is governed by the UAW-General Motors Corporation National Agreement (also referred to herein as "the collective bargaining agreement") which contains a four step grievance procedure culminating in binding arbitration before an impartial umpire. (LeTourneau Decl., ¶¶5-6, Ex. A) Under the grievance procedure in the 2003 UAW-GM National Agreement, a grievance may be presented at the first step by any employee, with or without the assistance of a union committeeperson. (*Id.*, Ex. A, ¶¶ 28-29) Grievances not resolved by discussions with the supervisor at Step 1 may be reduced to writing if the union committeeperson wishes to pursue the grievance further, and may be pursued by the Union to higher management through four steps of the grievance procedure. (*Id*., ¶¶30-43)

At the Fort Wayne GM plant, the first two (2) steps of the grievance procedure are handled by Local 2209 union representatives, and Step 3 is handled by the UAW International Representative. (LeTourneau Dep. 7; LeTourneau Decl., ¶8) Richard LeTourneau was the UAW International Representative responsible for grievances at the Fort Wayne plant from 2003 through the present. (LeTourneau Decl., ¶¶3, 8) A grievance not successfully resolved in the Third Step of the procedure may be appealed to final and binding arbitration before an impartial Umpire. (LeTourneau Decl., ¶¶6, 8) Throughout all of the steps of the grievance procedure, the decision whether to appeal, settle or withdraw a grievance is solely within the discretion of the Union representative. (*Id.*)

Berning began work at the Fort Wayne plant in May 1995 as a production worker. (Berning Dep. I, 24) In September 1999, Berning began to experience pain in her elbow, shoulder

and upper back for which she sought treatment by the GM medical department. (*Id.,* 27-29)

Berning's physical problems continued, and by June 2001, Berning was at odds with GM

management over the classification and extent of her physical job restrictions and whether or not

her injuries were work-related and covered by worker's compensation insurance.[1] (*Id.,* 44-46,

49-50).

  As part of her attempt to obtain worker's compensation benefits and the resulting

classification of her physical job restrictions as work-related, Berning filed a series of grievances

against GM under the collective bargaining agreement. (Berning Dep. I, Exs. 5, 7, 8, 13).  These

grievances complained that GM's medical director and plant nurse were intentionally interfering

with her ability to obtain worker's compensation coverage for her injuries based on a

discriminatory motive. (*Id.,* 74) Berning was contemporaneously pursuing a claim for worker's

compensation through the Indiana Worker's Compensation Board. (*Id.,* 48, 110-111, 117) Of the

four (4) grievances filed over Berning's issues with the GM medical department, the first two

grievances were settled, while the second two grievances over alleged discrimination (i.e.,

paragraph "6a" violations) are the subject of her present breach of duty of fair representation

claims against Union defendants. (*Id.,* 131).  Because the grievances all arose out of the same

facts, the court will review the history and disposition of all four related grievances.

_____

  [1] In June 2001, Berning filed a state worker's compensation claim against GM
concerning her injuries. The case was heard by the Indiana Worker's Compensation Board in
May 2006, and findings of fact and conclusions of law were issued in August 2006. These
findings are being administratively appealed by Berning to the full Worker's Compensation
Board, according to statements made in the Indiana Attorney General's Non-Party's Motion for
Protective Order and to Quash Subpoena. (Non-Party's Motion for Protective Order, Document
46 in the instant proceedings).

Berning's first grievance arose when, in the course of her dispute with GM over the extent and nature of her injuries, she discovered certain errors in the medical records maintained by the GM medical department. On or about October 2, 2002, Berning, through her Union representative, filed a written grievance alleging improper conduct on the part of the GM medical director (Dr. Espinosa) and plant nurse (Rick Wilde) consisting of intentional mistakes in her medical records in retaliation for her report of a threat made by Dr. Espinosa. (*Id.,* 51-52, Ex. 5) The grievance requested an investigation by the GM plant personnel director.

Shortly thereafter, on or about October 22, 2002, a second written grievance was filed, charging that false information had been placed in Berning's medical records and requesting a meeting with the plant personnel director. (*Id.,* 62-63, Ex. 7) The false information discovered by Berning dated as far back as three (3) years before the grievance was filed, to September-October 1999. (*Id.,* 40, 63) The Union appealed these grievances to the Third Step of the grievance procedure where they were settled by the UAW International Representative. (*Id.,* 53-59, 72, Ex. 6; LeTourneau Decl., ¶ 9) To settle these two grievances, GM agreed to schedule a meeting between Berning and the plant personnel director to address her issues with the medical department, and the grievances were withdrawn on that basis. (Berning Dep. I, Ex. 6) Berning met with the plant personnel director pursuant to the grievance settlement (*Id.,* 139), but was dissatisfied with his "attitude" and therefore failed to follow up on his request that she submit in writing her three main concerns with the medical department. (*Id.,* 56-59) In addition, certain corrections were made to mistakes in her medical records as a result of her grievances. (*Id.,* 63)

Berning's next grievance concerning the medical department was filed on or about

November 20, 2002, and repeats many of the allegations of her previous grievances, but also

alleges discrimination. (*Id.,* 73-75,131, Ex. 8) This grievance alleges as follows:

> Charge management in direct violation of paragraph
> 6A of the N/A. Rick Wild [sic] and Dr. Espinosa are
> using intimidation & coercion tactic as retaliation
> on Linda Berning for reporting a threat made by Dr.
> Espinosa. They are also inhibiting & preventing fair
> treatment from others by giving false information or
> by deliberately omitting important facts. Demand
> that GM no longer tolerate this offensive & abusive
> behavior [sic] an immediate investigation by Jim
> Deluca to include discussion with Linda B. [sic]
> repair problems created by Dr. and Rick Wild [sic]
> deceptions, disciplinary action for violations of
> paragraph 6A of the N/A.

(*Id.*, Ex. 8) This is the first grievance that is the subject of the present lawsuit.

The contract clause which Berning alleged was violated is Paragraph 6a of the National

Agreement between GM and the UAW. This provision is the non-discrimination clause of the

collective bargaining agreement, and states, in pertinent part, as follows:

> It is the policy of General Motors and the UAW that the provisions
> of this Agreement be applied to all employees covered by this
> Agreement without discrimination based on age, race, color, sex
> religion, national origin, disability or sexual orientation as required
> by appropriate state and federal law. Any claims of violation of
> this
> policy, claims of sexual harassment or of any laws regarding
> discrimination or harassment on account of disability may be taken
> up as a grievance.

(LeTourneau Decl., Ex. A, ¶6a.)

This discrimination grievance by Berning concerns a perceived threat made by the plant

medical director, Dr. Espinosa, three (3) years earlier on October 19, 1999, in which the

Espinosa told Berning that he could put her out of the plant any time he wanted to for depression

(a threat that was never carried out). (Berning Dep. I, 37-39, 73-74) Berning contested the

diagnosis of depression in her GM medical records, which she claims is one of the false entries

made by the GM medical department. (*Id.,* 40) Berning further contends by her grievance that in

retaliation for reporting the threat by Dr. Espinosa, GM was denying her worker's compensation

claim, or otherwise interfering with her ability to obtain worker's compensation benefits and

work-related job restrictions, by deliberate falsehoods and omissions in her medical records.

(*Id.,*68-76, 99) She asserts that this conduct constitutes a violation of the non-discrimination

provisions of paragraph 6a of the contract because the denial of worker's compensation coverage

was motivated by their belief that she suffered from the disability of depression. (*Id.,*13-14, 190)

This first 6a grievance was ultimately withdrawn by Berning's Local 2209 Union

representative Mark Orr (her zone committeeman) on or about March 20, 2003, for the stated

reason of "no cited discrimination per para. 6A of the N/A." (*Id.,* 76-77, Ex. 8) Orr, who had

processed her previous two grievances against the medical department (*Id.,* 55), could not

remember why Berning claimed there was unlawful discrimination, and so withdrew it. (*Id.,* 76,

Ex. 23, p. 3) Berning presented no testimony or evidence of hostility by Orr toward her at the

time that he withdrew her first 6a grievance in March 2003. Berning did not discover that the

grievance had been withdrawn until the following year, in May or June 2004. (*Id.,* 133-135, Ex.

15).

Dissatisfied with this disposition of her grievance, Berning initially pursued her internal

union remedies under Article 33 the UAW Constitution and filed a written appeal of the action

on July 2, 2004, with her Local Union. (*Id.,* 135-136, Ex. 15) As a result of proceedings in the

Local Union on Berning's internal union appeal, which will be detailed <u>infra</u>, a second 6a

grievance was filed on Berning's behalf on September 3, 2004, which was intended to replace the first withdrawn 6a grievance. (*Id.*, 81, 151-152, Exs. 9, 13)

This second 6a grievance was processed through the contractual grievance procedure by the UAW International Representative, Richard LeTourneau, who assumed responsibility for the grievance on September 30, 2004, when it was appealed to Step 3. (LeTourneau Decl. ¶ 11, Ex. C) On November 4, 2004, LeTourneau appealed the 6a grievance to Step 4 for decision by an impartial Umpire. (*Id.*) Fourth Step proceedings are handled by International Representatives in Detroit. (*Id.*)  Although LeTourneau did not believe the grievance had merit as a 6a violation, he had processed the grievance to Step 4 at Berning's request while she pursued her worker's compensation claim and outside remedies against the GM doctor. (LeTourneau Dep. 15-16, 21-22, 28-29, 35) Based upon LeTourneau's history of dealing with members' complaints about Espinosa and Wilde, he did not believe he could establish that Berning was treated any worse than other employees in the plant who had complained to the Union for years. (*Id.*, 41-42, 57-58, 63-68) Other employees had complained to LeTourneau about worker's compensation denials as well as impolite and inappropriate demeanor toward employees by the medical department. Consequently, LeTourneau did not see any basis for proving a discrimination claim under paragraph 6a. In LeTourneau's opinion, Berning's issues were more appropriately addressed by worker's compensation proceedings, and perhaps a malpractice action against the doctor. (*Id.*, 15-16)

Berning soon became suspicious of the Union's intentions and dissatisfied with the slow pace of their efforts in resolving her second 6a grievance. In mid-March 2005, Berning made an oral request to the Local 2209 Recording Secretary that her original 6a grievance be reinstated.

(Berning Dep. I, 172) She had become worried that LeTourneau was not serious about pursuing her second 6a grievance due to comments he made to her and statements from others. (*Id.*, 166-168, Ex. 23, pp. 6-7) LeTourneau purportedly threatened to drop her grievance because she had complained to the Local 2209 Shop Chairman about his failure to pursue the grievance. (*Id.*, Ex. 23, p. 8) By May 9, 2005, while the grievance was at Step 3, Berning filed formal charges with the National Labor Relations Board alleging that the Union had breached its duty of fair representation toward her. (*Id.*, 184, Ex. 26) Within days of the NLRB charge, Berning documented her belief that Mark Orr had breached his duty "of fair and timely representation" in his handling of her first 6a grievance in the internal union charges she filed against him. (*Id.*, Ex. 23)

Once she learned that LeTourneau had appealed the second 6a grievance to Step 4, Berning concluded that "they weren't really fighting it" and that "sending it to the fourth step umpire was just a stalling tactic" because the umpire did not have authority under the contract to rule on her discrimination claim, and the remedy demanded by the grievance could not be won. (*Id.*, 186-188, Ex. 28) Further, she believed the Union never intended to adequately represent her in the grievance process because the Union had refused to accept additional evidence she attempted to submit at Step 3 and the Step 4 UAW representative refused to meet with her on the grievance since she had filed an NLRB charge. (*Id.*)

Because LeTourneau did not believe the grievance had merit as a 6a violation, on September 9, 2005, he recalled the grievance from Step 4 back to Step 3 to avoid arbitration of a nonmeritorious grievance. (*Id.*, 21, 25, 27-28; LeTourneau Decl. ¶11 , Ex. C ) When Berning learned of the Union's recall of the grievance back to Step 3, she telephoned LeTourneau on

September 19, 2005, to find out why. (Berning Dep. I, 207-208) In this conversation Berning

learned that her Union representatives had never believed that her 6a grievance was valid, and

that the Union was going to drop the grievance at Step 4 and never arbitrate it. (*Id.*, 206-210,

Ex.39) She documented this conversation in a letter she sent the NLRB:

> On 9/19/05, I had a phone conversation with Rich LeTourneau.
> Rich stated that Mark Orr wrote the new grievance to keep me
> quiet during election time. Rich claimed that Orr told the "boys
> in Detroit" to ignore my grievance because it wasn't really a "6A"
> grievance. Rich said that Debbie Chamberlain, from the 4th step
> umpire section, was about to drop my grievance because she also
> didn't believe it was a "6A." Rich stated that the real reason he
> pulled my grievance back to step 3 was to save it because he hates
> Espinosa so much.

(*Id.*, Ex. 39, p. 4) In this conversation LeTourneau also confirmed Berning's belief that the

requested remedy was unobtainable, informing Berning that he would be unable to settle the

grievance at Step 3 because "[t]here was no way he could negotiate for the demands that Mark

Orr had put on the grievance." (*Id.*, Ex. 39, pp. 1-2) And when Berning asked to add more

information to the grievance for LeTourneau to use at Step 3, LeTourneau once again rejected

the offer because there was never any intent to pursue the 6a grievance as meritorious:

> So I'm asking Rich, can I now add this information? That's when
> he finally says, no, you know, they never really intended for them
> to – for this to be a real grievance, they just did this to shut you up.

(*Id.*, 209)

No Step 3 meeting was held, and no action was taken on the grievance between

September 19, 2005 and March 20, 2006, when Berning filed the present lawsuit. In the interim,

Berning filed yet another NLRB charge against the Union (to be discussed in more detail infra)

alleging that the Union never intended to pursue the second 6a grievance. (*Id.*, 195-196, Ex. 34).

This charge was dismissed in January 31, 2006. (*Id.*, Ex. 35).  The grievance was later withdrawn by LeTourneau at Step 3 on July 27, 2006, when GM would not offer any further resolution.

(LeTourneau Dep., 28-29, 36, 46-47, 51, 56-57; LeTourneau Decl., ¶ 11; Berning Dep. I, Ex. 38)

In support of the merits of her grievance, Berning asserts that the actions of Espinosa and Wilde constituted a violation of the non-discrimination provisions of paragraph 6a of the collective bargaining agreement because they were improperly motivated by their belief that she suffered from depression. (*Id.*, 13-14, 190) Berning has proffered only speculation in support of her claim:

> Q.    What is the basis of your claim that the reason they're doing all this to you is their belief that you suffer from depression?
>
> A.    Now, this is what I say the reason is. Now, if they have another reason, I'd like to know what it is. This is the only reason I can think of. I have -- I can prove that these things have been done to me, and this is the only reason that I know of as to why.

(Berning Dep. I, 191-192) Berning failed to cite any examples of similarly situated employees being treated differently, and was in fact aware that Dr. Espinosa treated other employees poorly, that the Union had a "stack full" of complaints about Espinosa and the medical department, and that LeTourneau had "tried for years to do something about Espinosa." (*Id.*, Ex. 23, p. 6; also 163, 152; Berning Dep. II, 272-274).  Berning nevertheless maintained that she was the victim of "extreme" discrimination:

> People who are unfair and who discriminate don't do it equally to everyone. And I believe that in my case Espinosa, you know, even though I believe he has treated other people unfairly, I think that in my case it's extreme. One example would be the medical records. Another example would be the way he has handled my restrictions. Another example would be the fact that I think that if he isn't

> exactly responsible for the Work Comp, he is at least somewhat
> responsible for them denying my case.

(*Id.*, 273-274) LeTourneau, however, had dealt with numerous employee complaints about

restrictions and worker's compensation denials over the years. (LeTourneau Dep., 42, 57)

Under Article 33 of the UAW Constitution, a UAW member has the right, at a

membership meeting or in writing to the local union recording secretary, to challenge the actions

of the Local Union, or its officials, in a wide range of areas including grievance handling.

(Curson Aff., ¶4; Ex. 1, Art. 33) If the member wishes to challenge the actions of an agent of the

International Union, the challenge is filed directly with the International Executive Board

("IEB"). (*Id.,* Art. 33, §§2(a) and 3(d)) A member has sixty (60) days to initiate an appeal to the

local union membership. (*Id.*, Art 33, §§3(a) and 4(c)) If the membership rejects this challenge,

or does not act, the member has the right to appeal within thirty (30) days to the International

Executive Board. (*Id.*; §§3(d) and 4(c)) Appeals initiated with the IEB, such as appeals from

actions of an International Representative, must be brought within thirty (30) days. (*Id.*, §4(c))

Under the UAW Local 2209 Bylaws, Article 33 appeals filed with the Local Union

Recording Secretary are initially referred to the Local Union Executive Board (LEB), or, if the

appeal involves grievances under the collective bargaining agreement, to the Shop Committee,

for initial decision after consultation with the grievant. (Zent Decl., Ex. D, Art. 13, §1(A), (B))

The decision of the Shop Committee or LEB is to be rendered within thirty (30) days of

notification of the appeal, and if dissatisfied with the decision, the grievant, within thirty (30)

days of notification, must submit a written appeal to the Recording Secretary for consideration at

the earliest possible membership meeting. (*Id.*, Art. 13, §1(C)) The member may thereafter

appeal the action, or lack of action, by the Local Union to the IEB within thirty (30) days, as

detailed above, under Article 33 of the UAW Constitution. (Curson Aff., ¶4; Ex. 1, Art. 33, §§2(a), 3(d) and 4(c))

In many cases, an appeal to the IEB results in a hearing. (Curson Aff., ¶5) At the hearing, the member has the right to be represented by counsel, to produce evidence, and to submit a brief. (*Id.*, ¶5) If the member is dissatisfied with the decision of the IEB, the decision may be appealed to either the Public Review Board ("PRB"), which is established under Article 32 of the UAW Constitution, or the Convention Appeals Committee ("CAC"), which consists of elected delegates pursuant to Article 33 of the UAW Constitution. (Klein Aff., ¶4; Curson Aff., ¶¶ 6, 7; Ex.1, Arts 32 and 33, ¶3(e) and (f)). A union member has thirty (30) days to initiate this step of appeal. (*Id.*, Ex. 1, Art. 33, ¶4(c)). The PRB consists of distinguished individuals not working under the jurisdiction of the UAW. (Klein Aff., ¶¶4-6) Both the CAC and the PRB have authority to order the Union to pay the member money damages on appeal. (Curson Aff., ¶9; Klein Aff., ¶10).

Each and every dues paying member of the UAW is sent a copy of the newspaper known as SOLIDARITY, which is published by the UAW. (Kerson Aff., ¶¶3, 4) SOLIDARITY has published numerous articles over the years advising members of rights to appeal under the UAW Constitution. (*Id.* at ¶5; Exhibits 2-12).

The UAW and GM have entered into an agreement on Reinstatement of Grievances which provides that an employee who successfully appeals to the International Executive Board, the Public Review Board or the Convention Appeals Committee can have a grievance reinstated into the contractual grievance procedure. (LeTourneau Decl., ¶7; Ex. B) The Letter on Reinstatement of Grievances is published as Document No. 52 in the Interpretations, Statements,

Letters and the Memorandum of Understanding on Health and Safety, of the 2003 UAW - GM National Agreement.(*Id*.)

The UAW Constitution also contains provisions under Article 31 "Trials of Members" for preferring charges against and conducting internal union trials of members for violations of the UAW Constitution and for any "conduct unbecoming a member" (such as violence, crossing union picket lines, etc.). (Curson Aff., ¶4; Ex. 1, Art. 31) Because these proceedings are quasi-criminal in nature, the Local Union Executive Board (LEB) is charged with conducting a preliminary review of any charges for sufficiency, similar to a criminal arraignment or preliminary hearing. (*Id*., Ex. 1, Art. 31, §3) The test for sufficiency of charges excludes disputes over grievance handling from Article 31 trial procedures (*Id*., Ex. 1, Art. 31, §3(c) and (d)), since such matters are to be decided by the membership subject an to Article 33 appeal. Under Article 31 procedures, if the LEB orders a trial after such review, the accused may appeal that decision to the IEB (effectively, an interlocutory appeal of the LEB ruling), thereby suspending any trial proceedings pending disposition by the IEB. (*Id*.) Upon appeal of the LEB ruling, the IEB does not review the underlying facts or substantive merits of the charges, but only whether the charges meet the procedural and subject matter requirements specified in Art. 31, §3(a) through (e). (*Id*.; see also Curson Dep. 8-11, 14) Article 31 proceedings are thus distinct from internal union appeal proceedings under Article 33, much as criminal and civil proceedings are separate and serve different functions in the court system.

In the present case, Berning did initiate an Article 33 appeal when she discovered that her first 6a discrimination grievance had been withdrawn at Step 2. On July 2, 2004, Berning submitted a written appeal to the Local 2209 Recording Secretary specifically invoking her

16

Article 33 appeal rights: "I, Linda Berning appeal the settlement of grievance #D31524 per article 33 section 3A of the international constitution." (Berning Dep. I, 135-138, Ex. 15) Pursuant to the Local 2209 Bylaws, the appeal was referred to the Local Union Shop Committee for consideration. (*Id.*, 145- 146, Ex. 16)

The Shop Committee met with Berning to consider her appeal on August 17, 2004. (*Id.*) After much discussion, Berning was informed that her grievance would be reinstated if she could show them that it would be unlawful to discriminate based only on GM's belief that she suffered from depression. (*Id.*, 147, 150-151) Berning later submitted a summary of disability discrimination law outlining the "regarded as" disabled violation. (*Id.*, 148-149, Ex. 17) Thereafter, her Union representative approached her and told her that it would be easier to file a new replacement 6a grievance than to try to reinstate the withdrawn 6a grievance.[9] (*Id.*, 151-152) The new grievance was drafted for her signature, and although Berning did not like the wording of the new grievance as compared to her original grievance, she signed it. (*Id.*, 152-156, Ex. 13) The replacement grievance was filed on September 3, 2004. With the filing of this second 6a grievance, Berning states that her understanding of the status of her Article 33 appeal concerning the first 6a grievance was that the appeal was "tabled . . . until the new grievance was successful," at which time she would drop her appeal. (*Id.*, 158; see also 151-152, 156, 251)

In the months after the second 6a grievance was filed, Berning became dissatisfied with the apparent lack of progress on her second 6a grievance. (*Id.*, 166-170) In March 2005, Berning called Local 2209 Recording Secretary Carol Schultz and requested that her original 6a grievance be reinstated. (*Id.*, 172) Schultz informed her that her grievance could not be reinstated because her grievance appeal had been withdrawn. (*Id.*, 173) After a meeting between Berning

and Schultz on March 17, 2005, Schultz sent Berning a letter informing her that her Article 33 appeal had been withdrawn based on her agreement with the Shop Committee to file a new 6a grievance. (*Id.*, 173- 175, Ex. 21) Berning received this notice by certified mail on April 28, 2005; however, the letter was erroneously dated September 20, 2004, a date shortly after her appeal had been considered and the new 6a grievance had been filed.

Because she disputed the assertion that she had withdrawn her Article 33 appeal and had questions about the seemingly back-dated letter, Berning scheduled another meeting with Recording Secretary Schultz on May 4, 2005. At that meeting, Schultz printed, signed and delivered a second letter to Berning, also incorrectly dated September 20, 2004, stating that the LEB found no wrongdoing in the settlement of her first 6a grievance, that her appeal was denied, and that if she disagreed with the decision, she had "certain rights and obligations under Article 13 of the Local 2209 Bylaws and Article 33 of the International Constitution."[2] (*Id.*, 175-177, Ex. 22) These two letters, which notified Berning that her Article 33 grievance appeal had been withdrawn and/or denied, are the only written determinations Berning received concerning the status of her Article 33 appeal and have never been rescinded. (Berning Dep. I, 177; Berning Dep. II, 287; Curson Dep. 59, 82)

Instead of pursuing her appeal rights under Article 13 of the Local 2209 Bylaws and

---

[2]  According to Recording Secretary Carol Schultz, the error in the dates on these two letters was a clerical oversight. The second letter had originally been drafted in September 2004, but never sent because the Union Shop Chairman told Schultz it was unnecessary due to Berning's withdrawal of the appeal. (Schultz Dep. 10, 16-19, Exs. D, E ) Berning apparently disbelieves this explanation, but has no contrary evidence. Whether the back-dating was unintentional or purposeful, however, is not determinative since Berning's remedy was to appeal the letters under Article 33. Berning refers to the April 28 and May 4, 2005, letters as the "fraudulent letters." (Berning Dep. I, 227-228)

Article 33 of the UAW Constitution, Berning responded to these letters by preferring internal

union charges against Mark Orr, the Local 2209 zone committeeman she believed to be

responsible for the mishandling of her grievance and for the issuance of the back-dated letters

disposing of her Article 33 appeal. (Berning Dep. I, 178-180, Ex. 23; Curson Dep., 33-39, 57-59,

80-81) These charges were filed with Local 2209 on May 11, 2005, and expressly refer to Article

31:

> I charge that Mark Orr has willfully violated the Constitution & has
> engaged in condut [sic] unbecoming of a union member. . . .
> Article 31 I charge Mark Orr for engaging in conduct unbecoming
> a member of the union . . . .

(Berning Dep. I, Ex. 23)  Berning's statement that accompanies the charges contains assertions

that she never agreed to withdraw her Article 33 appeal and that Mark Orr was responsible for

the back-dated letter stating she had withdrawn her appeal, but concludes only with the above

Article 31 charges against Orr and contains no request to appeal either of the September 20,

2004 letters disposing of her Article 33 appeal.

The LEB considered the Article 31 charges and initially ordered that jury selection and

trial proceedings begin at the June 2005 Local Union membership meeting. (*Id.*, 180, Ex. 24) No

trial was held, however, because Orr filed an appeal of the LEB determination with the IEB

pursuant to Article 31 procedures, and trial proceedings were suspended per the UAW

Constitution. (*Id.*, 180-181; Curson Dep. 62) In December 2005, the UAW IEB issued a written

decision upholding Orr's appeal, finding that Berning's charges against Orr were not a proper

subject for Article 31 trial proceedings because they concerned "grievances and how they were

allegedly handled or mishandled." (Berning Dep. I, 182, Ex. 25 at p. 7; Curson Dep., 50) In such

19

cases the member's "remedy lies in the regular procedures established for such review under Article 33 of the Constitution."  (Berning Dep. I, Ex. 25, p. 7) In pursuing these charges against Orr, Berning intentionally chose to forego further pursuit of her Article 33 appeal and, instead, file under Article 31, "Trials of Members." As she admitted during her questioning of a UAW Administrative Assistant to the President concerning the IEB decision dismissing her charges:

> Q.      I have the ability to choose whether to file a 33 or a 31.
>
> A.      You're absolutely correct. And you chose to do a 31 and it failed.
>
> Q.      Right, because–you claim it failed because I didn't fulfill 3D.

(Curson Dep., 107; also 80-83, 90-91).

Berning does not claim to have pursued her Article 33 appeal procedures concerning the withdrawal of her 6a grievance beyond her meeting with the Shop Committee in August 2004 and her March 2005 oral request to Recording Secretary Schultz to reactivate her grievance. (Berning Dep. II, 288-290, Ex. 30) After she received notice on April 28, 2005, that the Local Union considered her appeal withdrawn, Berning filed no further appeal of the withdrawal of her 6a grievance as required by Constitutional procedures. (Curson Aff. ¶ 11; Curson Dep. 33-37, 57-60, 80-83, 85, 89-91) Rather, she allowed her Article 33 appeal to lapse and instead chose to pursue alternative remedies in her Article 31 charges against Orr and collateral attacks against the other Union officials and bodies, none of which could have resulted in reinstatement of her grievance as would an Article 33 appeal.

In May 2005, contemporaneously with the submission of her internal union charges against Mark Orr, Berning filed her first unfair labor practice charges against Local 2209 with the National Labor Relations Board (NLRB), alleging a failure "to properly represent member

20

Linda Berning with regard to workplace concerns and grievances she has filed with the Employer." (Berning Dep. I, Ex. 26) This charge concerned the Union's failure to handle her "6A grievance honestly or properly." (*Id.*, 184) Berning argued to the NLRB that the Union was breaching its duty of fair representation even in the handling of the second 6a grievance which was pending, and that the appeal of the grievance to arbitration at Step 4 was just a stalling tactic because the umpire would not have authority to rule on a 6a violation. (*Id.*, 185-187, Ex. 28) This first NLRB charge was dismissed by the NLRB Regional Director for lack of merit on July 22, 2005, which dismissal was affirmed on September 29, 2005. (*Id.*, 183-184, Exs. 29, 30) Berning's appeal to the NLRB General Counsel, which outlined her grounds for claiming a breach of the duty of fair representation even though the second 6a grievance was at Step 4 awaiting arbitration, was submitted by August 5, 2005, more than six months before she filed the present lawsuit. (*Id.*, 276-277 , Ex. 28)

Shortly after the dismissal of her NLRB charge was upheld, Berning filed a second NLRB charge against Local 2209 on October 31, 2005. (*Id.*, 195-196, Ex. 34) This charge contained more specific allegations about the handling of her 6a grievances, alleging as follows:

> On April 28, 2005, member received a certified letter signed by the local recording secretary that was fraudulent. The Union has knowingly tolerated this intentional wrongdoing, and has encouraged and participated in cover up of the malicious and outrageous behavior. Union is in breach of duty of fair representation and good faith.
>
> In the last six months and before, the Union has dealt dishonestly with member and intentionally misrepresented facts, circumstances, and status of 6A grievance. Officer who wrote 6A grievance deceived member and never intended for grievance to be pursued. The Union has knowingly tolerated this intentional

21

> wrongdoing, and has encouraged and participated in cover up of
> the malicious and outrageous behavior. Union is in breach of duty
> of fair representation and good faith.

(*Id.*) This charge was also dismissed by the NLRB Regional Director, and that dismissal was

twice affirmed by the NLRB General Counsel after appeal and reconsideration requests by

Berning. (*Id.*, 195-196, Exs. 35, 36, 37)

On March 20, 2006,  Berning filed, in this court, a *pro se* complaint for breach of the

duty

of fair representation against the Union defendants, along with a breach of contract action

against her employer, General Motors Corporation (GM), under Section 301 of the Labor

Management Relations Act (LMRA), 29 U.S.C. §185.[3] In her complaint, plaintiff alleges that

Union defendants have failed to fairly represent her concerning the GM's alleged violations of

paragraph "6a" of the collective bargaining agreement, and that they "intentionally inflicted

emotional distress." (Complaint, ¶ III)

The Union defendants have now requested summary judgment on the grounds that: (1)

Berning failed to exhaust internal union remedies available to her under the UAW International

Constitution to protest the actions of the International or Local Union prior to filing her

Complaint; (2) Berning's complaint is barred by the applicable statute of limitations because it

was filed more than six months after Berning knew or should have known the facts constituting

her breach of the duty of fair representation claim against Union defendants; (3) the undisputed

material facts cannot support a finding that Union defendants breached their duty of fair

---

[3]  On December 15, 2006, plaintiff's subsequently filed action against General Motors
under the Americans With Disabilities Act (ADA) was consolidated with the instant case. As
Unions are not defendants in the ADA action, those allegations are not addressed herein.

representation toward Berning; and (4) any cause of action for intentional infliction of emotional distress is preempted by Section 301 of the Labor-Management Relations Act and/or subject to dismissal as a pendent state law claim.

In support of their motion for summary judgment, the Union defendants first argue that Berning failed to exhaust internal union remedies which could have provided full relief.  The UAW Constitution provides members who are unhappy with the disposition of their grievances in the contractual grievance procedure with a right to file an internal union appeal under the procedures of Article 33 of the Constitution. Under an agreement between the UAW and GM, if a union-represented employee pursues an internal union appeal, and that appeal is upheld by the International Executive Board (IEB), Public Review Board (PRB) or Convention Appeals Committee (CAC), the employee's grievance can be reinstated in the contractual grievance procedure and the grievance then processed as if it had never been wrongfully resolved. The Seventh Circuit and other courts have repeatedly required UAW members to exhaust internal union remedies that can result in reinstatement of their grievance before pursuing a federal claim for breach of the union's duty of fair representation. *See, e.g., Hammer v. UAW, Local Union No. 550,* 178 F.3d 856, 858 (7th Cir. 1999); *Sosbe v. Delco Electronics Division of General Motors*, 830 F.2d 83, 86 (7th Cir. 1987).

The Supreme Court in *Clayton v. UAW*, 451 U.S. 679 (1981), established the principles governing the lower courts' enforcement of the requirement that employees exhaust internal union remedies before bringing duty of fair representation suits against their union. The plaintiff in *Clayton* had been discharged and was seeking reinstatement and damages. Unlike GM, the employer in *Clayton* had no agreement with the UAW permitting reinstatement of an employee's

23

grievance after a successful union appeal. The plaintiff in that case could have obtained damages through the internal union appeal procedures but could not have been reinstated to his employment. Under those circumstances, the Court held that the internal union procedures were not adequate and that the plaintiff in that case was not required to exhaust his internal union remedies before suing the union for breach of its duty of fair representation.

The Supreme Court recognized that a different result might be reached in cases where the remedies could either grant the employee full relief or reactivate his grievance. As the Court stated:

> Where internal union appeals procedures can result in either complete relief to an aggrieved employee or reactivation of his grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual labor disputes. In such cases the internal union procedures are capable of fully resolving meritorious claims short of the judicial forum.

451 U.S. at 692. The Supreme Court noted that the policy in favor of exhaustion is especially strong where an internal appeal can return an employee's complaint to the contractual grievance procedure. Exhaustion of internal union remedies in this context supports the strong federal rule requiring exhaustion of the grievance-arbitration procedures contained in collective bargaining agreements before suit can be brought over the terms of the agreement. *Id.,* at 692 n.20. *See Republic Steel Corp. v. Maddox,* 379 U.S. 650 (1965).

The requirement that a plaintiff exhaust internal union remedies that can result in reinstatement of a grievance was established in this circuit in *Miller v. General Motors Corporation,* 675 F.2d 146 (7th Cir. 1982). In *Miller* the Court required exhaustion of remedies under the UAW Constitution which could have resulted in reactivation of a grievance for a UAW member under a contractual Reinstatement of Grievances agreement, even though the

24

reactivation of the plaintiff's grievance might not afford him all the relief which he could receive

in federal court. In support of its holding, the Seventh Circuit concluded:

> As long as the intra-union appeals process could result in the
> reinstatement of a grievance, thus bringing it back within the
> framework of the collectively negotiated procedure for settling
> contract disputes, final resolution of the employee's contractual
> grievance is possible through the preferred private means.

675 F.2d at 149. Thus, the Seventh Circuit determined that requiring exhaustion of intra-union

remedies under the UAW negotiated system was consistent both with national labor policy and

with guidelines for applying the exhaustion requirement outlined by the Supreme Court in

*Clayton.*

In *Hammer v. UAW, Local Union No. 550,* 178 F.3d at 858 and *Sosbe v. Delco*

*Electronics Division of General Motors*, 830 F.2d at 86 (7th Cir. 1987), the Seventh Circuit

followed its holding in *Miller* by again requiring exhaustion of UAW internal procedures under

UAW-negotiated reinstatement of grievances agreements. *See also, Garner v. International*

*Union, UAW,* 800 F. Supp. 706, 711 (S.D. Ind. 1991) (exhaustion of UAW internal remedies

required where internal procedures can result in reactivation of grievances); *Adams v. Ford*

*Motor Co.*, 670 F. Supp. 237 (N.D. Ill. 1987), *aff'd* 852 F.2d 570 (7th Cir. 1988).

While the Seventh Circuit requires the trial court to exercise its discretion in deciding

whether exhaustion of internal union remedies is required in a particular case, it places the

burden on plaintiff to set forth facts "showing that the intra-union procedures are inadequate

under *Clayton.*" *Fulk v. United Transportation Union*, 108 F.3d 113, 116 (7th Cir. 1997). *See*

*also Lewis v. Local 100, Laborers International Union*, 750 F.2d 1368, 1382 (7th Cir.

1984)(exhaustion of remedies excused where union procedures, unlike UAW remedies, involved

review of plaintiff's claims by the same individuals who had previously demonstrated personal animosity toward plaintiff). *Compare Sosbe v. Delco Electronics*, 830 F.2d at 86-87 (plaintiff's failure to exhaust internal union remedies not excused where plaintiff failed to allege hostility or futility at higher steps of the UAW appeals procedure). *Accord Hammer v. UAW*, 178 F.3d at 859. *See also Garner v. UAW,* 800 F. Supp. at 714 (distinguishing *Lewis* where plaintiff could not show hostility at higher levels of UAW procedures); *Seniority Research Group v. Chrysler Motor Corp.*, 976 F.2d 1185, 1189 (8th Cir. 1992)(holding that UAW procedures must be exhausted and that a showing of hostility at each step of the UAW procedures is required, citing *Sosbe*); *Wagner v. General Dynamics*, 905 F.2d 126, 128 (6th Cir. 1992)(failure to exhaust UAW remedies not excused absent a showing that even the Public Review Board cannot fairly review plaintiff's claim).

As the Union defendants point out, the same UAW appeal procedures approved in the foregoing cases were available to plaintiff Berning in the present case. A review of the evidence shows that although Berning did initiate an appeal of the withdrawal of her first 6a grievance pursuant to Article 33 of the UAW Constitution and the Local 2209 Bylaws, she abandoned the process by failing to pursue her appeal beyond the Local Union to the IEB level at which reinstatement of her grievance could be ordered. Her appeal filed with the Local 2209 Recording Secretary, after a meeting with the Local Shop Committee, resulted in a new 6a discrimination grievance being filed on her behalf. Even taking as true Berning's assertion that her internal union appeal was only "tabled" pending "successful" processing of the replacement grievance, she nevertheless failed to exhaust her Article 33 appeal procedures. Thus, after she contacted the Local 2209 Recording Secretary in March 2005 to request revival of her first 6a grievance

because of her dissatisfaction with the handling of the second 6a grievance, she received two letters from the Local Union notifying her that the Local had terminated further processing of her appeal. One letter informed her that she had withdrawn the appeal in exchange for expedited processing of the replacement grievance, while the other letter informed her that the LEB denied her appeal after consideration of the merits. These letters remain the only official record of the Local 2209 disposition of her grievance appeal.

Although Berning was clearly aware of the Article 33 appeal procedures of the UAW Constitution, and the Local 2209 denial letter advised her of her appeal rights under Article 33, she took no further action to appeal the written notices of withdrawal and/or denial of her appeal by Local 2209, despite her vehement disagreement with the letters.[4] But even if Berning is permitted to disregard the so-called "fraudulent" letters from the Union disposing of her appeal simply because she refused to believe they were legitimate, she nevertheless remained obligated under Article 33 to appeal the failure of Local 2209 to act on her March 2005 request to revive her appeal and/or original grievance.[5] See Curson Aff., Article 33, §1(d) of Ex.1. Such an appeal

---

[4]  Berning did file several collateral internal union actions in the next four months after she received the letters:  internal union charges against Mark Orr, the Union representative who withdrew her grievance; and internal union charges against the Local 2209 President and the UAW Regional Director and his assistant when the trial proceedings on her charges against Orr were suspended pending Orr's appeal of her charges against him. These filings were expressly pursuant to Article 31 "Trials of Members," seeking sanctions against individuals for their conduct, rather than Article 33 "Appeals," and did not directly seek reversal of the April-May 2005 letters which had terminated her grievance appeal, or otherwise seek reinstatement of her 6a grievance.

[5]  Berning testified, in fact, that she requested reinstatement of her first grievance in March 2005 due to the Local Union's failure to act: "I wasn't going to just sit there and let it be tabled forever." (Berning Dep. I, 172).

to the IEB of the Local Union's failure to act must be filed within thirty (30) days. (*Id*.; §4(c)) Since Berning first requested to reactivate her grievance in March 2005, a full year before she filed her lawsuit, her time limit for filing an appeal to the IEB had long expired, and she had clearly abandoned her internal union remedies for reinstatement of her withdrawn 6a grievance.

Berning neglected altogether a second opportunity to appeal Union defendants' mishandling of her discrimination grievances when she chose not to appeal the July 27, 2006, withdrawal of her second 6a grievance. While it can be argued that she should have earlier appealed the Union's failure to actively process the second grievance, which lay dormant since September 2005 when it was returned to Step 3 by International Representative LeTourneau, even when Berning was finally informed that LeTourneau had withdrawn the second grievance, she failed to initiate any internal union appeal of that action, relying instead on her then pending litigation.[6]

Thus, Berning missed at least three opportunities to perfect an appeal to the IEB for reinstatement of her 6a discrimination grievances: (1) when Local Union officials failed to "untable" her appeal or reactivate her original grievance in March 2005; (2) when the "fraudulent" letters confirming the withdrawal and denial of her appeal issued in April-May 2005; and (3) when the Union withdrew her second 6a grievance in July 2006. Instead, Berning chose to file NLRB charges, internal union charges against Local and International Union representatives, and charges against the IEB for issuing a decision dismissing one of her internal

---

[6] An appeal of LeTourneau's withdrawal of her grievance should have been filed within thirty (30) days directly with the IEB, since LeTourneau is an International Union representative. (Curson Aff., Ex. 1, Art. 33, §§2(a), 3(d) and 4(c))

union charges.  However, Berning never filed direct internal union appeals of the decisions or actions themselves. Under all of these circumstances, Berning's failure to exhaust her internal union appeals cannot be excused. Exhaustion is particularly appropriate in the instant case because Berning's grievance does not involve reinstatement of a terminated employee or back pay remedies. Rather, Berning alleges discriminatory conduct resulting in erroneous and misleading information and omissions in her medical files. Reinstatement of her grievance would allow full relief by bringing her grievance "back within the framework of the collectively negotiated procedure for settling contract disputes." *Miller,* 675 F.2d at 149.  Accordingly, this court agrees with the Union defendants that Berning failed to exhaust fair and adequate internal union remedies.

The Union defendants next argue that Berning's claims are barred by the applicable six month statute of limitations.  Berning has brought this action under Section 301 of the LMRA, 29 U.S.C. § 185, which provides federal jurisdiction over hybrid suits by employees against their employers for breach of a collective bargaining agreement and against their unions for breach of the union's duty of fair representation. *See Vaca v. Sipes,* 386 U.S. 171 (1967). Claims against a union for breach of the union's duty of fair representation are subject to a six-month statute of limitations. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 154-155 (1983); *Johnson v. Graphic Communications International Union*, 930 F.2d 1178, 1182 (7th Cir. 1991). The six-month period begins to run when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged breach of its duty. *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir. 1999); *Chapple v. National Starch & Chem. Co.*, 178 F.3d 501, 505 (7th Cir. 1999); *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d

299, 304 (7th Cir. 1983), *cert. denied,* 464 U.S. 1070 (1984). A claim against a union can accrue even in the absence of any official notification from the union concerning a plaintiff's grievance, and prolonged inaction can be sufficient to give a diligent plaintiff notice that the union has breached its duty of fair representation. *Pantoja v. Holland Motors Express., Inc.*, 965 F.2d 323, 327 (7th Cir. 1992); *Metz v. Tootsie Roll Industries,* supra.

In the present case, Berning filed her action on March 20, 2006, alleging the Union's failure to fairly represent her concerning her 6a discrimination grievances, including the then-pending second 6a grievance. At the time she filed suit, Berning's second 6a grievance lay stagnant at Step 3 for more than six months after International Representative LeTourneau recalled it from Step 4 arbitration. Berning clearly believed, as her Complaint alleges at ¶ IV, that the Union did not intend to support her 6a discrimination claims and had thus breached its duty of fair representation even though the second grievance had not yet been withdrawn. A review of the record shows that Berning knew of the Union conduct that serves as the basis for her Section 301 lawsuit as early as mid-March 2005, and certainly well before September 20, 2005, six months before she filed her action.

In fact, Berning has provided a voluminous paper trail establishing her knowledge of the Union conduct constituting the breach of duty that she now seeks to litigate. In mid-March 2005, Berning informally requested reinstatement of her original 6a grievance because she was not pleased with the Union's processing of her second 6a grievance. Thereafter, on April 28, 2005, Berning received a letter from the Recording Secretary stating that her appeal of the original grievance had been withdrawn in exchange for expediting the second 6a grievance. Berning responded with NLRB charges against the Union and internal union charges against her Local

2209 representative who withdrew the original grievance, both of which detail her knowledge of the conduct she now asserts was a breach of the duty of fair representation.

The internal union charges she filed May 15, 2005, against her Union representative Mark

Orr cite a 1967 Supreme Court ruling that the union "owes a duty of fair & timely representation" and charge Orr with breach of that duty. (Berning Dep. I, Ex. 23, p. 2) She goes on to detail Orr's lies, deception and hostility regarding the first 6a grievance and the withdrawal of her appeal. The Orr charges also reveal her belief that International Representative Richard LeTourneau was going to use her complaint filed with the Indiana Attorney General as "an excuse not to persue [sic] my 6A grievance" (*Id.*, Ex. 23, p. 7), as well as other concerns with LeTourneau's representation and the unwarranted delay in processing. This is the same misconduct which she now offers as evidence of the Union's breach of its duty of fair representation.

It has long been the law in this circuit that a diligent plaintiff can be charged with knowledge of an alleged breach of the duty of fair representation even without formal notice of a refusal to act from the union. *Christiansen v. APV Crepaco,* 178 F.3d at 915; *Pantoja*, 965 F.2d at 327, citing *Metz*. In *Pantoja*, the Seventh Circuit relied on a letter the plaintiff had written to union officials that "revealed Pantoja's belief that the union probably would not help him," finding that his cause of action against the union accrued as of the date of that letter. *Id.* In finding that the claim had accrued, the Court stated:

> [A] claim against a union can accrue even though the union never officially notifies the plaintiff that it will not do what the plaintiff requested. Prolonged inaction is sufficient to give a diligent plaintiff notice that the union has breached its duty of fair

representation.

965 F.2d at 327. Similarly, Berning's Orr charges expressly reveal her belief that the Union was

breaching its fair representation duty and did not intend to pursue her second 6a grievance. In

*Scott v. UAW Local 879*, 242 F.3d 837, 839-40 (8th Cir. 2001), the cause of action against the

UAW accrued when the plaintiff filed charges against the union's executive board, even though

the grievance had not been formally withdrawn at that time. Like Berning's charges against Orr,

the plaintiff in *Scott* made allegations that his union representative breached his duty of fair

representation by failing to handle grievances in a proper manner. The court held that the internal

charges demonstrated the plaintiff's knowledge of facts sufficient to form the basis for his claim

against the union.

To the extent that Berning is seeking to extend her limitations period by relying on her

subsequent efforts at union meetings and elsewhere to "untable" her old grievance, or on

conversations with International Representative LeTourneau concerning the status of her second

6a grievance, her reliance is misplaced. A long line of Seventh Circuit cases establishes that once

the plaintiff is aware of the union's failure to pursue a grievance, repeated requests to a union to

take action or reconsider cannot delay accrual of the claim or create a continuing violation.

*Christiansen*, 178 F.3d at 916; *Pantoja*, 965 F.2d at 328 (concerning request to "reactivate"

withdrawn grievance); *Adams v. Budd Co.,* 846 F.2d 428, 431 (7th Cir. 1988), *cert denied*, 488

U.S. 1008 (1989); *Sosbe v. Delco Electronics*, 830 F.2d at 86.

Nor is the limitations period here altered by the filing of the second 6a grievance. In

*Christiansen*, the union eventually filed a grievance on behalf of the plaintiff based on her

original complaint. The court held: "subsequent union action on the same grievance does not

restart the limitations clock." *Id.* citing *Sosbe*, supra (claim accrued when union initially denied grievance, not when subsequently filed grievance was withdrawn). Indeed, *Sosbe* and *Christiansen* permit a colorable argument that Berning's claim accrued upon the withdrawal of her first 6a grievance. Assuming, as Berning contends, that withdrawal of her first 6a grievance in March 2003 (which she reportedly did not discover until June 2004) was a breach of the duty of fair representation, even the possibility of reopening that grievance does not negate accrual of her claim. In *Simmons v. Howard University*, 157 F.3d 914 (U.S. App. D.C. 1998), plaintiff delayed filing suit based upon representations by his union representatives that his grievance might be reopened. The court explained that this did not prevent accrual of the cause of action against the union:

> Moreover, even if there was some possibility after June 30, 1996 (six months before Simmons filed this suit) the Union would reopen his grievance--indeed, even if there is still such a possibility--that would not mean that the Union had not already breached its duty of fair representation; reopening Simmons' grievance after the deadlines provided in the collective bargaining agreement had passed might have remedied, but it could not prevent, the Union's breach.

*Id.*, at 917, citing *Cohen v. Flushing Hosp. and Med. Ctr.,* 68 F.3d 64, 67 (2d Cir.1995) (any hope plaintiff had that union would change its position is immaterial for statute of limitations purposes once plaintiff has articulated the grounds for his § 301 claim); *Arriaga-Zayas v. International Ladies' Garment Workers' Union,* 835 F.2d 11, 13 (1st Cir.1987) (arbitration of grievance did not prevent accrual of hybrid § 301 when it was unclear whether union's representation of plaintiffs in arbitration proceeding would be adequate).

The record is replete with other evidence of Berning's knowledge of the Union's alleged breach of its duty of fair representation. In addition to Berning's charges against Orr, her first

unfair labor practice charges filed May 9, 2005, further demonstrates the accrual of her claim. Her NLRB charge alleged the Union's failure to properly represent and Berning presented evidence and argument to the NLRB that her second 6a grievance was not being handled "honestly or properly." (Berning Dep. I, 184) At the time she filed this unfair labor practice charge, Berning's knowledge of the Union's alleged mishandling of her 6a grievances included the same alleged misconduct that she detailed in her contemporaneous Orr charges. Further, her written appeal of the NLRB Regional Director's dismissal of her charge contends that the Union was mishandling the replacement 6a grievance because: (1) the grievance was poorly written and requested a remedy that could not be granted; (2) the Step 4 umpire is not permitted to rule on discrimination other than for union activity; and (3) she had been denied the opportunity to add information to her grievance at Step 3. (*Id.*, Ex. 28) Berning asserted to the NLRB that this established that "they weren't really fighting it" and that "sending it to the fourth step umpire was just a stalling tactic." (*Id.*, 186-187)

The foregoing unfair representation allegations asserted before the NLRB in May 2005 are the very same allegations and evidence Berning is presenting to this court in support of her Section 301 action against Union defendants. The Seventh Circuit has recognized that an unfair labor practice charge filed over the same conduct as the complaint is evidence that plaintiff knew that the union would not pursue plaintiff's claims. *Adams v. Budd Co.,* 846 F.2d 431, citing *Gustafson v. Cornelius Co.,* 724 F.2d 75, 77 (8th Cir. 1983). The notion that NLRB unfair labor practice charges signal accrual of a claim against the union is widely held, as noted by the court in *Simmons v. Howard University*, 157 F.3d at 916:

> An unbroken string of precedent supports the proposition that
> when a plaintiff accuses his union of a breach of the duty of fair

> representation in a charge filed with the NLRB, he has by then, as a
> matter of law, "discovered" the grounds for his hybrid § 301 claim.
> *See Washington v. Service Employees Int'l Union, Local 50,* 130
> F.3d 825, 826 (8th Cir.1997) (hybrid § 301 claim accrued when
> plaintiff filed NLRB charge); *Livingstone v. Schnuck Mkt., Inc.,*
> 950 F.2d 579, 583 (8th Cir.1991) (same); *Adams,* 846 F.2d at 431
> (same); *Arriaga-Zayas v. International Ladies' Garment Workers'
> Union,* 835 F.2d 11, 13 (1st Cir.1987) (claim accrued when
> plaintiffs filed "informative motion" with Puerto Rico Labor
> Relations Board detailing union's alleged failure adequately to
> represent them); *Gustafson v. Cornelius Co.,* 724 F.2d 75, 79 (8th
> Cir.1983) (claim accrued when plaintiff filed NLRB charge); *see
> also Cohen,* 68 F.3d at 67 (claim accrued when plaintiff wrote
> letter to Anti-Defamation League complaining of union's failure to
> represent him).

Clearly, Berning's May 9, 2005, unfair labor practice charges against the Union claiming a failure "to properly represent Linda Berning with regard to workplace concerns and grievances" establishes that her claims against Union defendants had accrued at least by that date, which is more than ten (10) months before she filed this Section 301 action.

Even if it could be argued that the processing of Berning's second 6a grievance to the Step 4 decision before an Umpire delayed accrual of her cause of action because of the possibility of arbitration of her grievance (despite Berning's contentions, as set forth above, that the grievance allegations were deficient and that the Union had no intention to arbitrate), it is undisputed in the record that Berning learned of the Union's recall of the grievance from arbitration and back to Step 3 sometime before September 19, 2005, more than six months before her suit was filed. (Berning Dep. I, 206-210, Ex.39) In her September 19, 2005, telephone conversation with LeTourneau, Berning learned that her Union representatives never intended to pursue her 6a grievance as valid, that the grievance was going to be dropped at Step 4 and never arbitrated, that LeTourneau had recalled it from arbitration simply to forestall the inevitable

withdrawal of the grievance, and that he could not negotiate any meaningful settlement (which Berning knew all along) and had no interest in gathering more evidence from Berning in support of the grievance.

From the above it is clear that Berning knew the facts giving rise to her breach of the duty of fair representation claim as early as one year before she filed suit, when she attempted to revive her first 6a grievance, and in any event no later than September 19, 2005, when International Representative Richard LeTourneau admitted to Berning that the Union never intended to pursue her grievance because it was not a "6a" grievance, and the remedy requested by the grievance was impossible to negotiate.

Furthermore, Berning's aborted internal union appeal of the grievance withdrawal failed to toll accrual of her cause of action beyond April 28, 2005, when she received written notice that her internal appeal had been withdrawn. She cannot rely on her subsequent collateral internal union actions to toll the running of her limitations period. Although the Seventh Circuit permits tolling of the statute while an employee exhausts internal union remedies, *Frandsen v. Brotherhood of Ry., Airline & Steamship Clerks,* 782 F.3d 674 (7th Cir. 1986), it has continually rejected tolling arguments based on repeated requests of and continued correspondence with the union to take action. *Pantoja*, 965 F.2d at 328-329; *Adams,* supra at 432; *Sosbe*, supra; *Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849, 852 (7th Cir. 1985). To toll the running of the limitations period, a plaintiff is required to pursue the specific constitutionally defined internal union procedures:

> [T]olling occurs while a plaintiff pursues specific internal union remedies through the designated channels; it does not occur while the plaintiff seeks whatever relief might be available.

*Pantoja*, 965 F.2d at 328.

In the present case, Berning initiated the specific internal union remedy available to accomplish reinstatement of her first 6a grievance, an Article 33 appeal.  However, when she received written notice on April 28, 2005, that Local 2209 considered her appeal withdrawn, she failed to pursue further appeal of that notice. And when her second 6a grievance was withdrawn July 27, 2006, Berning made no effort to appeal. Her collateral attacks upon the Union representatives and bodies she believed had wronged her were merely efforts to seek "whatever relief might be available" (*id.*) and would not have resulted in reinstatement of her grievance. Thus, they did not toll her limitations period. April 28, 2005 (the date Berning received written notice), is nearly eleven months before Berning filed the present action, and well outside the statute of limitations. Accordingly, this court agrees with the Union defendants that Berning's complaint is barred by the applicable six-month statute of limitations.

The defendants next argue that Berning has failed to establish that the Union breached its duty of fair representation.   Under federal law a union breaches its duty of fair representation only where its actions in representing an employee are arbitrary, discriminatory or in bad faith. *Air Line Pilots Assoc. v. O'Neill*, 499 U.S. 65, 67 (1991); *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *Trnka v. Local 688, UAW*, 30 F.3d 60, 61 (7th Cir. 1994).

Pursuant to the Supreme Court's decision in *Air Line Pilots*, a court's review of union conduct under the arbitrariness standard is extremely deferential. As the Court stated:

> [A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.

499 U.S. at 67. In *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997), the Seventh

Circuit held that a plaintiff has the burden "not just to establish that his position is as plausible as the union's, but to show that the union's position could eventually be deemed not even colorable." *See Trnka v. Local 688, UAW*, 30 F.3d 60, 61 (7th Cir. 1994). This deferential standard serves the important purpose of preventing courts from second-guessing the strategies and policies of employees' chosen bargaining representative. *McKelvin,* supra 868; *Ooley v. Schwitzer Div.*, 961 F.2d 1293, 1302 (7th Cir. 1992) *cert. denied,* 506 U.S. 872 (1992). Only an "egregious disregard for union members' rights" breaches the union's duty under this standard. *Garcia v. Zenith Electronics*, 58 F.3d 1171, 1176 (7th Cir. 1995).

By contrast, an assertion of union discrimination or bad faith requires inquiry into the union's subjective intent. *McKelvin,* supra; *Trnka,* supra at 61. To meet the burden to prove discriminatory or bad faith conduct, a plaintiff must establish both subjective hostility toward the plaintiff individually or as a member of a disfavored group and evidence that the hostility negatively impacted the union's representation. *Souter v. International Union, UAW*, 993 F.2d 595 (7th Cir. 1993) (evidence of racial hostility not tied to union action); *Ooley v. Schwitzer*, 961 F.2d at 1304 (hostility to plaintiffs immaterial where grievance is without merit); *Conn v. GATX Terminals Corp.*, 18 F.3d 417 (7th Cir. 1994) (hostility of union official must impact decision).

A union does not breach its duty under this standard when its actions are based on an evaluation of the merits of plaintiff's grievance which is either reasonable or in good faith. *Souter,* 993 F.2d at 598; *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1196 (7th Cir. 1990). Additionally, the Seventh Circuit has recognized in duty of fair representation cases that evidence that the defendant union pursued meritorious grievances for the plaintiff in the past supports an inference that subsequent refusals to represent the plaintiff are not based on hostility

or impermissible factors. *Crider v. Spectrulite Consortium*, 130 F.3d 1238, 1244 (7th Cir. 1997); *Souter*, 993 F.2d at 599.

As noted, Berning's first 6a grievance was withdrawn at Step 2 by her Local 2209 zone committeeman, Mark Orr, due to lack of merit as a paragraph 6a discrimination grievance. Berning has produced no evidence that Orr bore hostility towards her at the time he withdrew the grievance on March 20, 2003. In fact, Berning admits in Paragraph 4 of her response that she has no such evidence. Berning makes allegations of poor or negligent representation concerning Orr's failure to remember or present the "evidence" she gave him in support of her grievance. Furthermore, contemporaneously with the processing of the first 6a grievance, Orr assisted in the successful resolution of two related grievances addressing many of the same issues raised in her 6a grievance by appealing them to Step 3. The International Representative successfully resolved these two grievances at Step 3 by securing a meeting between Berning and the plant personnel director to discuss her issues with the medical department, in accordance with the relief requested in those grievances. This evidence supports the inference that withdrawal of the 6a grievance was not based on impermissible factors. *Crider,* supra; *Souter,* supra.

Moreover, the Union's conclusion that Berning's grievances lacked merit as discrimination grievances is certainly colorable and not arbitrary. Berning presented no evidence to back up her claim that the medical personnel took their actions for the improper motive that they believed she was depressed.  She admitted that she made that allegation only because she could think of no other reason why they would intentionally put false information in her records. (Berning Dep. I, 191-192) Clearly, Berning's unsupported beliefs are mere speculation insufficient to withstand summary judgment on the issue of arbitrariness. *Anderson v. Liberty*

*Lobby*, 477 U.S. at 252.

A review of the record shows that the undisputed evidence establishes that International Representative LeTourneau had a reasonable basis for concluding that the medical department was not discriminating against Berning and that no 6a violation could be proven.  Complaints from employees about the medical department, and especially Dr. Espinosa and nurse Rick Wilde, had been rampant for as long as the plant had been open. (LeTourneau Dep. 63-68, also 42, 57-58) Berning's complaints about their denial of her worker's compensation coverage and their brusque demeanor were repetitive of complaints LeTourneau had fielded from numerous employees over the years. LeTourneau's experience was that Espinosa treated all employees poorly. LeTourneau never believed the grievance had merit, but continued to process it and keep it open as a favor to Berning, at her request, while she pursued outside remedies against the doctor and against GM for her worker's compensation benefits (neither of which claims have since proven to have merit). While Berning alludes to instances in which LeTourneau may have become perturbed with her repetitive inquiries about the grievance, she cannot show that his hostility, if it amounts to that, negatively affected his handling of her grievance. In any event, any established hostility is immaterial because her grievance lacked merit. *Ooley v. Schwitzer*, supra.

As the record shows, the Union defendants' conclusion that Berning's discrimination claims in her 6a grievances lack merit was reasonable and not arbitrary. Further, Berning has not presented any evidence of hostility that could have affected the disposition of her grievances. Therefore, this court finds that Berning's allegations against the Union defendants for breach of the duty of fair representation are meritless and summary judgment will be granted in favor of

the Union defendants.

Finally, the Union defendants correctly argue that Berning's claims for emotional distress are preempted by federal law.  To the extent that Berning's allegation in her Complaint that the "union . . . has intentionally  inflicted emotional distress" (Complaint, ¶ III) is intended to state a separate cause of action, as opposed to an item of damages against theUnion defendants, it is clearly preempted by federal law governing the Union's duty of fair representation and by Section 301 of the LMRA, 29 U.S.C. § 185. *United Steelworkers v. Rawson*, 495 U.S. 362, 369 (1990); *Allis-Chalmers v. Lueck,* 471 U.S. 202, 220 (1985); *Vaca v. Sipes*, 380 U.S. 171, 177 (1967).

Section 301 of the LMRA provides federal jurisdiction over claims for breach of a collective bargaining agreement. In enacting Section 301, Congress intended that a comprehensive unified body of federal labor law govern interpretation of collective bargaining agreements. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957). As the Supreme Court stated in *Steelworkers v. Rawson:*

> The court has made clear that §301 is a potent source of federal labor law, for though state courts have concurrent jurisdiction over controversies involving collective bargaining agreements ... state courts must apply federal law in deciding these claims, and indeed any state law cause of action for violation of collective bargaining agreements is entirely displaced by federal law under §301 ... State law is, thus, 'preempted' by §301 in that only the federal law fashioned by the courts under §301 governs the interpretation and application of collective bargaining agreements.

495 U.S. at 368. In *Allis-Chalmers v. Lueck*, the Supreme Court held that state tort claims are entirely preempted by §301 if they are either "substantially dependent upon analysis of terms of an agreement made between the parties in a labor contract" or "inextricably intertwined" with the

terms of the collective bargaining agreement. 471 U.S. at 213. *See Chapple v. National Starch & Chemical Co.* 178 F.3d 500 (7th Cir. 1999)(state claims for wrongful discharge and intentional infliction of emotional distress preempted). Section 301 preempts state law claims against both the employer and the union where the conduct of the defendants must be measured against rights or duties created by the collective bargaining agreement. *Filippo v. Northern Indiana Public Service Corp.*, 141 F.3d 744, 750 (7th Cir. 1998).

Berning's state law claims against the Union defendants are also preempted under federal law governing the Union's duty of fair representation. As with Section 301 claims, federal substantive law governs fair representation claims and federal law must be applied whether the case is brought in state or federal court. *Vaca v. Sipes*, 386 U.S. at 177. As the Court concluded in *Vaca*:

> [Plaintiff's] complaint alleged a breach by the Union of a duty grounded in federal statutes and ... federal law therefore governs his cause of action.

Lower courts have repeatedly held since *Vaca* that contract, tort or other nominal state law theories are preempted when they are based on some claim related to the union's representational function. As the First Circuit stated in *Condon v. United Steelworkers*, 683 F.2d 590, 594-5 (1st Cir. 1982):

> A union's rights and duties as the exclusive bargaining agent in carrying out its representational functions [collectively comprise a field in which] the policy of the law is so dominated by the sweep of federal statutes that legal relations which [those rights and duties] affect must be deemed governed by federal law having its source in  those statutes, rather than by local law.

*See also BIW Deceived v. Marine Workers Local 86*, 132 F.3d 824 (1st Cir. 1997)(federal jurisdiction based on preemption of state law because plaintiffs' claims "though garbed in state

law raiment" implicate union's duty of fair representation).

In *Richardson v. United Steelworkers*, 864 F.2d 1162 (5th Cir. 1989), *cert. denied*, 495 U.S. 946 (1990), the court held that plaintiffs' state law claim based on the union's failure to advise them of the possible legal consequences of their decision to reject a final company offer and instead go on strike were completely preempted by federal law governing the union's duty of fair representation. The Fifth Circuit stated in *Richardson* that the federal duty of fair representation governs union conduct toward members of the bargaining unit whenever the union is representing them. 864 F.2d at 1167. As such, the duty is not limited solely to union actions in dealing with the employer, but also extends to union dealings with the employees it represents. *See also Swatts v. United Steelworkers*, 808 F.2d 1221, 1227 (7th Cir. 1986).

Berning's claims against Union defendants in this case all arise out of the Union's duty as her exclusive bargaining representative to enforce her rights under the collective bargaining agreement, including the Union's duty to fairly represent her with respect to her claims of discrimination in the workplace. The Seventh Circuit has repeatedly held that state law claims for intentional infliction of emotional distress are preempted where the resolution of those claims implicates rights under a collective bargaining agreement and/or the union's duty of fair representation. *Chapple v. National Starch,*178 F.3d at 506; *Filippo*, 141 F.3d at 750. Under this authority, any state law claim Berning seeks to assert for emotional distress is preempted and subject to the same defenses as her claim for breach of the Union's duty of fair representation. Thus, summary judgment will be granted in favor of the Union defendants on Berning's claim based on emotional distress.

<u>Conclusion</u>

On the basis of the foregoing, the Union defendants' motion for summary judgment is hereby GRANTED.

Entered: October 29, 2007.

s/ William C.  Lee
William C. Lee, Judge
United States District Court
