UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| LINDA BERNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:06cv87 |
| | ) | Consolidated with: |
| | ) | CIVIL NO. 1:06cv347 |
| | ) | |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### AMENDED OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant General Motors Corporation ("GM") on May 25, 2007. The plaintiff, Linda Berning ("Berning"), proceeding pro se, filed her response on July 5, 2007, to which GM replied on July 30, 2007. Berning then filed a sur-reply on August 14, 2007.

For the following reasons, the motion for summary judgment will be granted.

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

  Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

  So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of

Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

3

matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

## Discussion

GM claims that the following facts are undisputed. Berning began working for GM in May 1995, and has spent her entire career as an hourly employee at GM's Fort Wayne assembly plant where she has been represented by both a local and international union.  The terms and conditions of Berning's employment are governed by a local and national collective bargaining agreement.

On or about September 1, 9999, Berning visited the plant medical department due to some discomfort she alleged was due to pushing down dash mats while installing parts. Berning's records from the plant medical department regarding this visit also include an entry regarding another employee who was being treated for right hand pain allegedly suffered while performing a "gas fill" job.  (Berning Dep. at 30-31). On February 26, 2003, the plant medical doctor, Dr. Carlos Espinosa, added an entry to Berning's medical records reflecting that due to a transcription error, information regarding another employee was erroneously placed in her medical records. (Berning Dep. at 31-32).

Berning's plant medical history also indicates that she visited the plant medical department on October 19, 1999 for back pain, but Berning contends her visit that day was for a liver profile test. (Berning Dep. at 32-33). During her October 19, 1999 visit, Berning began crying due to pain and a lack of sleep. (Berning Dep. at 34). According to Berning, Dr. Espinosa

4

became angry with her, and told her that she was not in pain, but was suffering from depression. (Berning Dep. at 37-38). Dr. Espinosa then told plaintiff that he could "put [her] out for depression any time he wanted to" do so. (Berning Dep. at 38).

Around this same time period, due to the fact that Berning's job assignment was causing her pain, GM assigned Berning to a series of other jobs, and by July 2001 she was assigned to the "handle schedule" job. (Berning Dep. at 42-44). However, the transfers to other jobs during this period are not a basis for Berning's lawsuit. (Berning Dep. at 44. *See also* Berning Dep. at 84 - acknowledging that she was unable to perform her assigned job at the time of the transfer, and that she does not "blame" management for transferring her at that time).

In July 2001, plaintiff met with Mark Orr, her union representative, Mark Burnett, a GM management representative, Rick Wilde, a nurse in the plant medical department, and Dr. Espinosa. (Berning Dep. at 40-41). The purpose of the meeting was to discuss a series of problems Berning was having with her back, shoulder, neck and arm, as well as her belief that she should be given restrictions and that her impairments should be deemed work related and covered by workers' compensation insurance. (Berning Dep. at 44-45). The GM representatives at the meeting informed plaintiff that they would not issue restrictions, that they believed her condition was personal and not work-related, and that she would be required to use her own health insurance to cover any expenses related to the impairments. (Berning Dep. at 45). Berning had to pay a "deductible" of between five and fifteen dollars for her medical treatment visits as a result of her impairments not being covered by workers' compensation. (Berning Dep. at 46).

On May 13, 2002, the plant medical department issued a "Notice of Restrictions"

5

for Berning, which included limited neck movement, limited pushing and pulling with her left and right arms, and no work at or above shoulder level. (Berning Dep. at 49).  Berning wanted the restrictions, and her only complaint about them is that they were not considered work-related. (Berning Dep. at 49-50).  On or about October 1, 2002, Berning filed a grievance through the union charging GM management with intentional infliction of physical and emotional stress by Dr. Espinosa and Rick Wilde as retaliation for reporting the October 1999 "threat" by Dr. Espinosa, along with alleged "intentional mistakes" in her plant medical records. (Berning Dep. at 51-52).  On or about April 25, 2003, the October 1, 2002 grievance was resolved with an agreement that Berning would be granted a meeting with the plant personnel director. (Berning Dep. at 54-55).  Several months after the grievance was resolved, Berning met with the plant personnel director. (Berning Dep. at 55-56).

On October 22, 2002, Berning filed another grievance regarding the alleged placement of false information in her medical records. (Berning Dep. at 62).  Berning acknowledges that the September 1999 entry in her records was resolved by the May 26, 2003 correction. (Berning Dep. at 63).  Berning also alleges, however, that a series of other incorrect, misleading or incomplete statements in her medical records were not corrected. (Berning Dep. at 66-72). The October 22, 2002 grievance was resolved along with the October 1, 2002 grievance on or about April 25, 2003. (Berning Dep. at 72-73).

On November 20, 2002, Berning filed another grievance, this time charging management with a violation of paragraph 6A of the national collective bargaining agreement. (Berning Dep. at 73-74). In the November 20 grievance, plaintiff contended that she had been retaliated against by GM for reporting Dr. Espinosa's alleged "threat" in October 1999, by the

6

placement of false information in her plant medical records, the challenge to her workers' compensation claim, and the failure to provide her with work-related restrictions. (Berning Dep. at 74). One of Berning's union representatives dropped the November 20, 2002 grievance on or about March 20, 2003 based on a belief that Berning did not have a legitimate 6A grievance. (Berning Dep. at 76-77).

On September 3, 2004, Berning filed yet another grievance, this time charging Dr. Espinosa with a violation of paragraph 6A. (Berning Dep. at 80). At the time she filed the September 3 grievance, Berning had not had any contact with Dr. Espinosa in almost a year. (Berning Dep. at 80-81). The September 3, 2004 grievance was withdrawn without prejudice by agreement between management and the union on July 27, 2006. (*See* Settlement Sheet, attached to GM's Motion as Exhibit B).

In December 2004, Berning filed a consumer complaint against Dr. Espinosa with the office of the State Attorney General, and in July 2005, she filed a similar complaint against Wilde. (Berning Dep. at 87-89). In the consumer complaints, Berning alleged that she had been denied access to various records, including an OSHA 200 log, by the plant medical department. (Berning Dep. at 90-92). Berning contends that she felt unable to bid on other jobs, but admits she never attempted to do so. (Berning Dep. at 82-83). The plant medical department never ordered Berning out of the plant, and GM never told Berning that she could not come to work. (Berning Dep. at 83-84). Other than the 2001 transfer, which does not constitute a basis for Berning's lawsuit, GM never told Berning that she was unable to perform any job at the plant. (Berning Dep at 84).

On February 8, 2006, Berning filed a Charge of Discrimination with the Equal

7

Employment Opportunity Commission alleging that she was wrongfully regarded as disabled and retaliated against. (*See* Charge, attached to GM's Motion as Exhibit C).  On August 17, 2006, the Worker's Compensation Board of Indiana issued Conclusions of Fact and Law and an Award, finding that plaintiff was "entitled to compensation for 5 degrees of permanent impairment," but denying her remaining claims. *(See* Order of Worker's Compensation Board, attached to GM's Motion as Exhibit D).

In her response to GM's recitation of facts, Berning takes issue with the fact that her plant medical history reflects that she visited the medical department for a neurotic disorder, which she contends was "entirely and deliberately false".   Berning also disagrees with GM's assertion that her transfer to another job is not the basis for her lawsuit, and alleges that GM assigned her to other jobs that did not fit her medical restrictions and caused her physical and emotional pain.  However, Berning has no citation to the record for this allegation and, moreover, GM's assertion is taken directly from Berning's deposition where Berning stated that the re-assignments to other jobs are not part of her lawsuit. (Berning Dep. at 43-44).

Berning also offers unsubstantiated opinions relating to her characterization of the July 2001 meeting and the manner in which GM handled her 1999 worker's compensation claim.  Berning further claims, contrary to her direct deposition testimony, that she has other complaints about the work restrictions other than the fact that they were not considered work-related.  Yet Berning never fully states what her complaints are, or why she said in her deposition that her only complaint with the restrictions were that they were not listed as being work-related. (Berning Dep. at 50).   Berning also states that she never attempted to bid on any other job because she already knew she couldn't do so.  She states that "If I was unable to do a new job for

8

any reason, Espinosa would have me put out and say it was because of depression."  Thus Berning has admitted (again) that she never bid on any other job, and also implicitly admits that she might have gotten a different job had she bid on it, but she was afraid she would be unable to do the job and be fired for that reason.

Berning has brought claims against GM pursuant to both Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and the Americans with Disabilities Act ("ADA").  Berning's apparent theory is that she was perceived as disabled not only under the ADA, but also under a provision of the national collective bargaining agreement - Paragraph 6A - that prohibits disability discrimination.

In support of its motion for summary judgment, GM argues that Berning cannot establish a claim that she was regarded as disabled under the ADA or the collective bargaining agreement. GM first argues that Berning's claims are barred by the applicable statues of limitation.  "Claims brought pursuant to Section 301 of the LMRA are subject to a six month statute of limitations." *Mudra v. School City*, 2004 U.S. Dist. LEXIS 27829 at * 31 (N.D. Ind. 2004). "The statute begins to run 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [violation].'" *Id.* (quoting *Metz v. Tootsie Roll Industries, Inc.*, 715 F.2d 299, 304 (7th Cir. 1983)).

Berning filed her lawsuit alleging an LMRA violation on March 20, 2006. Accordingly, any viable claim must relate to conduct Berning discovered on or after September 20, 2005. Berning, however, concedes that her claim arises from alleged conduct that occurred beginning in October 1999, more than six years before she brought suit. Berning filed grievances protesting her alleged mistreatment in October 2002, and the grievances were resolved in April 2003,

9

nearly three years before she filed this lawsuit. Clearly, Berning is well past the six-month deadline, and her LMRA claim is time barred.

Berning's discrimination and retaliation claims suffer from the same fatal defect. An employee must exhaust administrative remedies before filing suit under the statutes governing claims of employment discrimination. *Doe v. R.R. Donnelly & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994); *Risk v. Ford Motor Co.*, No. 98-0698, 1999 U.S. Dist. LEXIS 9911, at *12 (S.D. Ind. June 1999) (citations omitted). This rule requires an employee to file a charge of discrimination within 300 days of the alleged discriminatory event. *See id.*

In the present case, Berning did not file a Charge of Discrimination until February 8, 2006, more than six years after the conduct about which she complains allegedly began. The uncontroverted facts demonstrate that all of the alleged conduct about which plaintiff complains as both discrimination and retaliation, including the plant doctor's alleged comments, the alleged falsification of medical records, the challenge to Berning's worker's compensation claim, the dispute over applicable restrictions, and the purported denial of requested documents, all came to her attention well over 300 days before plaintiff filed a Charge, given that she filed grievances and consumer complaints complaining of these alleged incidents years before going to the EEOC.

Berning, in response, contends that the statute of limitations began when she discovered "that the union had stopped pursuing their remedies", and that "the retaliation has been continuing." However, as GM notes, the issue of the union's pursuit of any remedies has no bearing on Berning's duty to timely file a Charge of Discrimination for any alleged violations of the ADA. "[I]n a discrimination case the relevant question is when the plaintiff should have

10

known that [the] defendant's conduct was discriminatory and had harmed her." *Patton v. John C. Groub Company, Inc.*, 2001 U.S. Dist. LEXIS 16878 at *21 (S.D. Ind. 2001). As noted above, it is apparent from numerous statements in Berning's deposition, as well as her filing of multiple grievances over the years, that she believed she had been discriminated and retaliated against well over 300 days before the filing of her Charge.

Likewise, under federal labor law, "[t]he statute of limitations begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Jointer v. Potter*, 116 Fed. Appx. 746, 748, 2004 U.S. App. LEXIS 22567 at ** 7-8 (7th cir. 2004). Berning has acknowledged that she was aware that her grievances had been dropped by her union by September 2004. As GM points out, this knowledge should have triggered Berning's obligation to pursue a court claim for any alleged LMRA violations, and Berning's decision to file another grievance regarding the exact same issues do not toll the limitations period.

In her sur-reply, Berning claims that the EEOC did not rule her case untimely and that it considered her case "to be a continuing violation because of the retaliation." However, the only ruling the EEOC made was the standard "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes". (Exhibit 1 to Berning's Response). The EEOC did not, as Berning asserts, rule that her case was timely[1].

Accordingly, this court finds that any claims for perceived disability discrimination or retaliation under the ADA are also time barred for failure to bring them within the prescribed limitations period.

---

[1] Even if the EEOC had made such a ruling it would not be binding on this court.

11

Next, GM argues that it did not regard Berning as being disabled.  In order to proceed on her perceived disability claim, Berning must present evidence that creates a genuine issue as to whether GM regarded her as having an impairment that substantially limited one or more major life activities. *Cassimy v. Board of Education*, 461 F.3d 932, 936 (7th Cir. 2006) (citing 42 U.S.C. § 12102(2)(C)). "The Supreme Court has defined 'major life activities' to include those activities that 'are of central importance to daily life,' such as 'walking, seeing and hearing.'" *Id.* (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002)). "This is a strict standard, . . . . [and] [n]ot every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." *Id.*

"There usually are . . . two issues to resolve in [a perceived disability] case. The first is whether the employer's decision to terminate or take some other adverse employment action against the employee was motivated by a mistaken belief that the condition precludes [her] from engaging in some activity." *EEOC v. Schneider National, Inc.*, 481 F.3d 507, 509 (7th Cir. 2007). "If so, the second question is whether the activity that the employer mistakenly believes the employee to be disabled from engaging in is a major life activity." *Id.* (citations and internal quotations omitted). In this case, as discussed in detail below, both questions posed above must be answered in the negative.

In the present case, Berning takes issue with a statement by the plant medical director nearly eight years ago referring to plaintiff as "depressed."  Berning argues that this statement demonstrates that GM believed she was in fact depressed, which she denies, and thus regarded her as disabled.  GM maintains that regardless whether actual depression can ever constitute a disability, *see Cassimy*, 461 F.3d at 936, the record here amply demonstrates that even if GM

12

believed plaintiff was depressed, the company never regarded her as unable to perform *any* tasks whatsoever as a result, let alone those in the category of "major life activities." This is best illustrated by plaintiff's unequivocal admissions that in the eight years since the plant doctor made the alleged comment regarding depression, plaintiff has not been placed on any sort of leave of absence, nor has she been denied a position to which she believes she was entitled. GM has directed the court to the Seventh Circuit's decision in *Krocka v. City of Chicago*, 203 F.3d 507 (7th Cir. 2000). In *Krocka*, the plaintiff contended that the Chicago Police Department regarded him as disabled when it required him to participate in a "Personnel Concerns Program" ("PCP") and subjected him to intensive supervision following his disclosure that he suffered from depression. 203 F.3d at 514. The Seventh Circuit rejected this claim, noting that despite knowledge of the plaintiff's impairment, the department allowed him to continue working as an officer, "without any restrictions on the type of duties he could perform . . . or any other aspect of his work." *Id.*  GM points out that, in the present case, not only was Berning not restricted from continuing to work in a regular job, the record does not reflect that GM engaged in any additional oversight regarding her performance, much less the intense scrutiny involved in *Krocka*.

　　The Seventh Circuit reached a similar conclusion in *Ogborn v. United Food and Commercial Workers*, 305 F.3d 763 (7th Cir. 2002), a case in which the plaintiff alleged, *inter alia*, that his union regarded him as disabled due to depression. The court affirmed the entry of summary judgment on the perceived disability claim based on the absence of evidence that the union "held exaggerated views about the seriousness of his illness." 305 F.3d at 768. Despite the fact that union officials had suggested to the plaintiff that he see a doctor and were aware that

13

he was reportedly depressed, the court found that the plaintiff had failed to present evidence that the defendant "thought that [his] depression prevented him from working for a length of time in excess of" a six-week period during which he was on medical leave. *Id.*

GM concludes that regardless of whether GM harbored any perception as to whether Berning suffered from depression, it quite obviously did not consider Berning to be substantially limited in her ability to work or perform any other major life activity. As Berning readily concedes, she remained actively employed on a continuous basis after the statements regarding any alleged depression, and Berning has offered nothing to suggest that her job assignment or duties were modified in any manner, or that she was denied or removed from any particular position, based on the plant medical director's comments or opinions.

Berning asserts in her response (and sur-reply) that the plant medical director's alleged statements that she was suffering from some form of depression create a triable issue as to whether she was regarded as disabled under the ADA.  However, as the case law above makes clear, even if GM believed that Berning suffered from depression, this does not establish a genuine issue as to whether the employee was perceived to be disabled.  Berning also attempts to make much of the fact that she lived in fear that she <u>might</u> suffer some sort of adverse job action based on the medical director's alleged misdiagnosis of depression.  As GM has noted, Berning's complaints are inherently speculative, and she cannot proceed to trial on an argument centering on only the potential for harm.  "A party must present more than mere speculation or conjecture to defeat a summary judgment motion."  *Liu v. T&H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1991).

Clearly Berning cannot be permitted  to proceed to a jury on a perceived disability claim

14

where she has failed to offer a shred of evidence that GM believed that she was somehow incapable of working or performing any activities of daily living in that it allowed her to continue working without interruption following the comment related to her alleged depression in 1999. *See Lucas v. Methodist Hospitals, Inc.*, 180 Fed. Appx. 585, 586 (7th Cir. 2006) (employer did not regard employee as disabled when it "employed her for many years" after she suffered various injuries); *see also Davidson v. United Technologies – Carrier*, 2000 U.S. Dist. LEXIS 20533 at *22 (S.D. Ind. 2000) (dismissing perceived disability claim despite allegations that employees referred to the plaintiff as "Crazy Willie" and "Prozac Willie" following his hospitalization for depression where the plaintiff remained employed and was promoted following his medical leave). Accordingly, Berning's ADA claim, as well as any similar claim based on an alleged breach of the collective bargaining agreement, is subject to summary judgment.

Next, GM seeks summary judgment on Berning's retaliation claim. Berning has alleged that GM retaliated against her because she complained about what she felt was discrimination based on her perceived disability. To succeed on her retaliation claim, Berning must show that after complaining of discrimination, she, and not any another similarly situated employee who did not complain, was subject to an adverse job action. *Roney v. Illinois Department of Transportation*, 474 F.3d 455, 459 (7th Cir. 2007). "[T]he employer's challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* at 461.

Based on her pleadings and deposition testimony, the crux of Berning's retaliation claim appears to center on the position taken by GM in response to a worker's compensation claim

15

filed by plaintiff in 2001. As an initial matter, GM reasserts its argument that any claim regarding GM's defense against Berning's worker's compensation claim is time barred, as plaintiff was aware in the summer of 2001 that GM did not believe her injuries were work related, but did not file a retaliation charge until 2006. *See Roney*, 474 F.3d at 459-60 (noting that plaintiff cannot recover for alleged retaliatory acts that occurred more than 300 days before filing of Charge).

GM next contends that even is plaintiff had filed a timely Charge, it is difficult to comprehend how GM's defensive posture in a litigated worker's compensation action could be deemed retaliatory or even an adverse action, especially under the circumstances presented here. The Worker's Compensation Board of Indiana issued a ruling that essentially validated GM's position, denying nearly all of Berning's claim and GM contends that the Board's findings belie any suggestion of retaliatory animus, thereby defeating Berning's retaliation claim.

As for the remaining aspects of plaintiff's retaliation claim, GM argues that none of the additional conduct of which plaintiff complains rise to the level of an adverse action. GM maintains that Berning has not carried her burden of demonstrating that incidents such as the placement of incorrect information in her medical records or the failure to provide her with requested documents "were enduring, disruptive, or had any effect that would dissuade a reasonable employee from complaining about discrimination." *Robertson v. Indianapolis Public Schools*, 2006 U.S. Dist. LEXIS 85417 at *16(S.D. Ind. 2006).

GM points out that the *Robertson* court has recognized that a retaliation claim may fail where the alleged retaliatory actions of the employer did not have "any chilling effect on [the plaintiff's] propensity to submit complaints and union grievances or file [a] lawsuit." 2006 U.S.

16

Dist. LEXIS at *17. In *Robertson*, the plaintiff continued filing grievances and legal actions after a series of transfers and a denial of counseling which she contended were retaliatory. *Id.* In the present case, Berning filed a total of four grievances, one EEOC Charge, a worker's compensation claim, and two federal lawsuits following the alleged retaliation against her. GM points out that it is apparent that its alleged actions did not deter Berning from taking action, "nor would these acts be expected to dissuade a reasonable person from doing so,".

In response, Berning claims that she suffered adverse employment actions when she was denied worker's compensation, when her restrictions were deemed personal, when false information was placed in her medical records and when false information was given to people "who make decisions that affect me and my job."

Clearly, however, an adverse job action "must be materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities." *Maman D. Bio v. Federal Express Corp.*, 2004 U.S. Dist. LEXIS 14447 at *23 (S.D. Ind. 2004). Actions meeting the definition include a termination of employment, a demotion evidenced by a decrease in wages, a less distinguished title, a material loss of benefits or significantly diminished material responsibilities. *Id.* However, "not everything that makes an employee unhappy is an actionable adverse action." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001). "The plaintiff's complaints must still pass muster under the standard stated in numerous Seventh Circuit cases: a significant change in the claimant's employment status." *Schmitt v. Portage Twp. Sch. Corp.*, 2004 U.S. Dist. LEXIS 26513, at *17 (N.D. Ind. 2004) (citing authority).

GM maintains that Berning cannot challenge the fact that her employment status with GM has not undergone any change at all since her disputes with the plant medical director and

17

others began in 1999, much less a change that might be described as "significant." GM states that it may be willing to accept for purposes of summary judgment the argument that denial of worker's compensation benefits could be actionable under some circumstances. Nevertheless, GM reiterates its arguments that its position in response to Berning's worker's compensation claim was entirely justified, and cannot form the basis of a discrimination or retaliation claim here.

This court agrees with GM that Berning has failed to present any sort of viable retaliation claim.  Accordingly, summary judgment will be granted in GM's favor.

### Conclusion

Based on the foregoing, GM's motion for summary judgment is hereby GRANTED.

Entered: October 31, 2007.

s/ William C.  Lee<br>
William C. Lee, Judge<br>
United States District Court